AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
11/16/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: _____JB_____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
November 16, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ____IM_____ DEPUTY

United States of America

v.

YAN FU,

Defendant.

Case No.   5:20-mj-00621-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 15, 2020, in the county of San Bernardino, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(1)(B)(i) | Laundering of Monetary instruments |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Christopher Cutaia*
Complainant's signature

CHRISTOPHER CUTAIA, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   November 16, 2020

_____
*Patricia Donahue*
Judge's signature

City and state:  Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Christopher Cutaia, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with Homeland Security Investigations ("HSI"), Department of Homeland Security ("DHS") and have been employed so since 2018. I am assigned to the HSI Office of the Special Agent in Charge in Los Angeles, California, where I investigate criminal violations relating to money laundering, wire fraud, mail fraud, and the importation/exportation of goods contrary to law. In becoming a special agent, I have completed advanced criminal investigative training to include the 26-week Criminal Investigative Training Program provided by the Federal Law Enforcement Training Center, Department of Homeland Security, in Brunswick, Georgia. I and the agents and police officers with whom I work are familiar with the methods and practices of fraud schemes and their operations, to include the use of deceptive phone calls and emails. I am also aware through my experience and training that actors in fraud schemes attempt to mask and conceal the source of their proceeds in an effort to avoid detection by law enforcement.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a criminal complaint against, and arrest warrant for, YAN FU (03/24/1963) for a violation of 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering).

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  STATEMENT OF PROBABLE CAUSE

**A.  Overview**

4.  The government is investigating fraud schemes in which scammers fraudulently induced victims, over the telephone, to purchase gift cards to resolve some nonexistent issue.  One common scheme was the government imposter scam, in which scammers impersonated Social Security Administration ("SSA") or other government personnel, telling victims that their social security numbers ("SSNs") had been compromised and that they had been used in various crimes throughout the United States, and that the victims had to provide money to fraudsters over the phone.  Another common scheme was the technical-support scam, in which scammers told victims that their computers had been hacked, and the victims had to provide money to pay for remedial measures the scammers would purportedly provide.  In all cases, the scammers told victims to buy gift cards issued by the retail store Target and read off the gift card numbers and access codes

over the phone to the scammers for the purported purpose of resolving the claimed issues.

5. In actuality, the scammers generally, through others ("money mules"), used the gift card information to purchase, with the proceeds of the fraud, high-value merchandise, such as electronic devices, at Target stores. The merchandise was then generally resold or returned to a Target store for store credit to load onto new gift cards to buy new merchandise. This cycle of transactions helped to conceal the source of the proceeds. There is probable cause to believe that YAN FU was one such money mule.

### B. Victim-1 Purchased Gift Cards at the Direction of a Telephone Scammer

6. Throughout this investigation, other investigators and I have interviewed numerous government-imposter and other telephone scam fraud victims across the United States. Summarized below is information provided by one victim, referred to hereinafter as Victim-1. I spoke with Victim-1 via telephone on or about August 22, September 2, and September 10, 2020.

7. Victim-1 is a retired 66-year-old male living in Streamwood, Illinois. Victim-1 resides with his adult daughter in the home that he owns.

8. Victim-1 stated he received an email on or about June 14, 2020 from what he believed was Amazon or "Prime" informing him of a charge incurred to his credit card for a large item purchase. Victim-1 stated the email directed him to call a phone number listed in the email in order to cancel the charge

3

if the charge was unwarranted.  Not recognizing the charge to his credit card he hadn't authorized, Victim-1 called the number listed and, believing he was speaking to personnel from his credit card's customer service, was informed there was fraudulent activity on his account.  Victim-1 stated he had difficulty understanding the individual on the phone due to what he perceived as a heavy "Indian" accent.  Victim-1 was informed by "customer service" personnel he would need to purchase Target and Amazon gift cards and relay card numbers with access codes to them over the phone in order to give them the ability to track down whoever was fraudulently using his funds.  Attempting to avoid further fraudulent activity on his account, Victim-1 followed the instructions and purchased physical gift cards at Target and Walgreens stores, and scratched off the sealing on the back to reveal the card numbers and access codes.  Thereafter, Victim-1 read the card numbers and access codes to the person with whom he was in contact on the phone.  Among the Target gift cards were card numbers 041-221-550-583-960 and 041-221-550-584-620, each funded with $500.00.

9.   Victim-1 stated he later became suspicious because he realized he had called the number listed in the email and not the actual number printed on the back of his physical credit card.  Shortly after, Victim-1 called the number printed on his credit card and found there had not been any unwarranted charges prior to him calling the phone number in the email he received.  Victim-1 then filed a fraud claim with his credit card provider

4

regarding the gift cards he was deceived into purchasing and providing over the phone.

    10. Based on my training and experience and my participation in this investigation, I recognize the scenario described by Victim-1 as consistent with a scam in which Victim-1 was deceived into providing gift cards to persons unknown to him based on false pretenses.

    **C.    YAN FU Used Proceeds from Victim-1's Gift Card to Purchase Items at a Target Retail Store**

    11. On June 15, 2020, HSI Special Agents surveilled FU as she departed her home in her personally leased vehicle. FU drove directly to a Target retail store located at 3944 Grand Ave, Chino, CA. Target National Investigations (TNI) personnel provided in-store security camera footage of FU at approximately 12:05pm (Pacific Time) conducting a purchase transaction in the electronics section for an Apple tablet at the post-tax cost of $861.99. FU is shown conducting the purchase through the Target mobile application (the "Target App") as the store clerk scanned digital gift cards 041-221-550-583-960 and 041-221-550-584-620 off FU's cell phone screen. According to information I received from Target, both gift cards had been purchased approximately 13 minutes earlier in the state of Illinois by Victim-1 as physical cards.

    12. Gift card 041-221-550-583-960 was used in its entirety for the Apple tablet purchase and the remaining funds from card 041-221-550-584-620 were used approximately eighteen minutes after the initial transaction at 12:23pm (Pacific) by FU in an

identical manner as Special Agents observed her drive to another Target store in Diamond Bar, CA.  FU again was captured on security camera footage by TNI conducting a transaction for additional Apple electronics utilizing her cell phone to render payment through digital gift cards.

13.  Throughout the rest of the day on June 15, 2020 and into the evening, FU was observed by HSI Special Agents travelling to approximately 16 different Target retail stores (including those noted above) throughout several cities in Southern California, such as Brea, Anaheim, Santa Ana, Irvine, Chino, and Fullerton, amongst others.  With assistance from TNI, I observed footage of FU conducting transactions at approximately 15 of the 16 stores for purchases and returns of mostly Apple electronics utilizing digital Target gift cards through the Target mobile app as a source of payment.

**D.   FU Knew the Criminal Nature and Purpose of Her Target Transactions**

14.  According to information I have learned from reports generated by the City of Brea Police Department ("BPD"), in September 2019, a BPD officer saw an individual (later identified as FU) returning, at a Target store, high-value Apple products.  According to Target personnel, the products had been purchased with gift cards the prior day, using a Target account that had been recently active with numerous purchases and returns, involving gift cards, across southern California.  A BPD officer observed FU walk to a car after exiting the store, open the trunk, and place a Target store bag in the trunk; the

6

BPD officer observed multiple Target store bags in the trunk already.

15.  After FU drove away, a BPD officer conducted a traffic stop after FU committed a vehicle code violation, and officers spoke to FU.  Among other things, FU indicated that she had a job that requires her to go to Target stores throughout Southern California and buy Apple and other products using gift cards that are in a Target application on her phone.  FU said she receives 2% of the total amount she is able to purchase each day.  FU indicated she meets each night with a third party to deliver the purchased items and receive her payment in cash.  FU consented to BPD's copying of the full contents of her cellular telephone ("FU's Cell Phone").

16.  I have reviewed data from FU's Cell Phone.  Many of the communications on FU's phone were in Chinese.  These communications were translated into English by a third-party contractor and provided to me on July 6, 2020.  The translated communications and original data, including images, from FU's Cell Phone collectively show that FU questioned the legality of what she was doing, and was confronted by numerous red flags about the legitimacy of her activities that she ignored, and that the transactions she conducted using those funds were designed in whole or in part to conceal or disguise the nature, source, ownership, or control of the funds.[1]

---

[1] The pronouns in translated conversations in this affidavit were supplied by the translator.

7

17. Specifically, among the relevant text messages on FU's Cell Phone were those that FU had exchanged with individuals using the monikers "Get-LAX" (hereinafter referred to as "LAX"), "hukeer" and "789," who apparently coordinated her Target transactions:

    a. Spanning from June through mid-September of 2019 were a multitude of messages in which FU received over 1,000 Target gift card numbers with corresponding access codes via a Chinese based messaging mobile application called "WeChat." According to numerous messages, displayed as ledgers, detailing high-value electronic merchandise purchased with gift cards she received, FU conducted roughly over $1 million in transactions at Target stores from June through mid-September 2019 while receiving direct payments for her services.

    b. Throughout this time frame, LAX, "hukeer," and "789" instructed FU to utilize roughly over 90 different Target App accounts to conduct these transactions. I know from my experience during this investigation and conversations with other criminal investigators, that frequently switching purchasing accounts is a common tactic used by fraudsters to avoid detection by law enforcement and corporate security personnel.

18. Upon commencing employment with LAX, FU was informed via WeChat message from on or about May 29, 2019 at 9:42pm of the "rules" of her new employment conducting purchases at Target retail stores in which she was told:

8

a. "You can only purchase up to 2 units of each product in each Target store; Must not purchase more than 2."

b. "You can only enter each Target store twice, twice at most! And you must check out at a different cashier's desk, never with the same cashier!"

c. "The value of each GIFT CARD is 500-2,000. Use them to pay for the products."

d. "The time limit to use up each GIFT CARD is 2 hours."

19. From conversations with TNI personnel, I know these "rules" are inconsistent with Target Corp. policies. Avoiding the same cashier twice and spending gift card funds quickly are both recognized as common tactics used by individuals participating in fraud schemes aimed at avoiding detection and expeditiously converting illegitimately sourced funds into merchandise that can be sold or other gift cards that can be used.

20. FU initially questioned the legality of the actions LAX asked of her in the following WeChat messaging exchange beginning on or about June 9, 2019:

| Date/Time | Sender | Content |
|---|---|---|
| 6/9/2019 8:53PM | FU: | "My family asked me whether the work I'm doing is legal or not." |
| 6/9/2019 9:55PM | LAX: | "So far we are not aware of any violation. And no complaint has ever been raised by any store clerk or shop managers. |
| 6/9/2019 9:55PM | LAX: | "If you are worried, shall I talk to the |

9

| | | |
|---|---|---|
| | | Boss and give you a break?" |
| 6/9/2019 9:58PM | FU: | "It's not about the shopping. I saw on the internet that people steal credit cards, and use them to purchase Target gift cards, and then shop with the gift cards." |
| 6/9/2019 9:58PM | FU: | "Shopping itself is not an issue." |
| 6/9/2019 9:58PM | LAX: | "We are not stealing credit cards and spending them." |
| 6/9/2019 9:59PM | FU: | "Okay, I trust you." |
| 6/9/2019 9:58PM | LAX: | "The Boss asks me to deliver the products to the Lao Wai [foreigners] and Lao Wai [foreigners] companies transfer money to us." |
| 6/9/2019 10:05PM | LAX: | "What else are you worrying about? I will check with my Boss and give you an answer." |
| 6/9/2019 10:09pm | FU: | "No need." |
| 6/9/2019 10:14pm | LAX: | "Okay. Shall we continue our work tomorrow?" |
| 6/10/2019 8:49am | LAX: | "Okay. Shall we continue our work tomorrow?" |
| 6/10/2019 8:49am | LAX: | "Today." |
| 6/10/2019 9:21am | FU: | "Work." |

21. Multiple messages from LAX to FU instructed FU to avoid identifying herself when conducting Target transactions. For example:

10

   a. In a text message exchange on or about May 30, 2019 at 4:18pm, FU requested more funds to complete a purchase for items LAX requested. LAX initially told her to use "the credit card" to make up the difference, but then stated "It's better that you pay cash . . . so they won't have a record of your credit card."

   b. In other messages concerning purchases of iPhones occurring on or about July 1, 2019 at 1:34pm, FU was told "Don't buy cell phones if they need to register your ID or SSN card!!"

   c. On or about July 10, 2019 at 10:51am, FU was told by LAX "When you are shopping in a store, ask whether you can buy cell phones, iPhone Xs, or Xs macs [sic]. If you can buy cell phones, tell him/her you need to buy full price, with no contract. No contract. Must not give them your driver's license, or your social. The only thing you do is to pay for it."

 22. As FU conducted numerous in-store transactions at multiple Target stores daily, she began to experience negative reactions and resistance from store clerks suspicious of her purchasing behavior, which she discussed with LAX:

   a. On or about June 5, 2019 at 1:19pm, after FU sent LAX an image of a Target purchase receipt, LAX stated there's "380 still left" and instructed FU to purchase another item, to which FU replied "I asked but they won't sell it to me."

   b. On the same date, at approximately 3:05pm, FU stated via audio message "They said they didn't have any of the

11

Apple products I wanted.  I think they have them. They just didn't want to sell to me."

   c. Again, that same day at about 6:14pm, FU stated via audio message "The store clerk here also said that there have been many people today buying the same things.  And then he said there is a purchase limit.  At first he seemed to have no problem of getting the products for me.  And then he heard me asking for this and for that . . . then he knew . . . and told me I could only get one (1) of each product.(making a sound of frustration)."

   d. Additionally, on or about July 12, 2019 at 6:21pm, FU stated via audio message "This place would not sell me anything.  I'm leaving now.  There was this one person. He/she was very bad.  I should have sneaked out behind his/her back.  Maybe he/she saw I was holding too many products when I passed in front of him/her.  He/she ran after me and called the manager.  And they said they would not sell me anything.  They simply wouldn't sell to me."

  23. On or about June 17, 2019, FU received the first of numerous messages from LAX instructing her to "convert" the digital gift cards sent to her into physical gift cards at self-checkout kiosks inside Target.  I know that if successful, FU would obtain a gift card with a different number than that of the original gift card.  TNI personnel have stated that purchasing physical gift cards with digital cards is not permitted and is against Target Corp. policy.  I know from my experience during this investigation and conversations with

other investigators that converting a retail store gift card to a numerically different gift card is a common tactic used by fraudsters to mask the initial card's source. Therefore, I recognize the act of "converting" digital gift cards to physical gift cards as an attempt at laundering the initial card's funds. Furthermore, I know from my experience during this investigation that combining the purchase of a low-cost item with the purchase of high-value gift cards in the same transaction is another common tactic used by fraudsters intended to mask a transaction's true purpose.

24. The following three sets of WeChat messages document exchanges between FU and LAX concerning converting digital gift cards to numerically different physical cards:

Message Set One

| Date/Time | Sender | Content |
|---|---|---|
| 6/17/2019 5:33pm | LAX: | "Use the self checkout machine, close to the entrance." |
| 6/17/2019 5:34pm | LAX: | "Pick up a bottle of drink, whatever drink you like. There are Target gift cards in the self checkout area. Pick up two (2) Target gift cards, and check out them together with the bottle of drink. Input nine hundred (900) for each gift card. Pay with the electronic cards in your cell phone. In this way, you will spend all the money in your electronic cards and convert it to physical cards. |

13

```
                             Do it now."
6/17/2019 5:34pm  LAX: "Go to the self checkout area."
6/17/2019 5:34pm  LAX: "Pick up a bottle of drink…"
6/17/2019 5:34pm  LAX: "…and two (2) gift cards."
6/17/2019 5:36pm   FU: "I saw got(sic) your messages. I have
                       left the store. I will do what you said
                       in the next store."
```

Message Set Two

```
Date/Time         Sender              Content
6/19/2019 10:10am LAX: "After shopping, if you still have
                       balance left, go to the self checkout
                       area, buy a bottle of water and a gift
                       card. Input the amount of balance, and
                       pay with the card in your cell phone.
                       Convert the balance in your cell phone
                       to a gift card and use it in the next
                       store.  Scratch off the card, take a
                       photo of the and the receipt."
6/19/2019 10:10am LAX: "Don't check out with a cashier."
6/19/2019 10:11am FU:  [A screenshot showing a Target gift card
                       balance on the mobile App.]
6/19/2019 10:13am FU:  [A photo of a Target receipt for a
                       purchase conducted with gift cards.]
6/19/2019 10:17am FU:  [A screenshot showing the Target App gift
                       card page with no balances remaining.]
6/19/2019 10:17am FU:  [A photo of a Target receipt for the
                       purchase of a bottle of water and a gift
```

14

                              card, with the physical gift card pictured as well.]

6/19/2019 10:18am LAX: "Go on."

6/19/2019 10:18am LAX: "Correct."

Messages Set Three

| Date/Time | Sender | Content |
|---|---|---|

6/22/2019 12:31pm LAX: "Now the balance of more than two hundred (200) dollars… you can go to a checkout machine and buy a gift card and spend it. Buy a card of two hundred and forty (240) or two hundred and fifty (250) dollars...you figure out the amount ...and spend it. The Boss said we should empty these small balances. For more than two hundred (200) dollars, there will be not managers coming and asking you to input password. I have checked, only when the purchase with a card is over five hundred (500)dollars, the self checkout machine will prompt the request for a clerk to come and scan his/her code. If less than five hundred (500) dollars, the self checkout machine would not prompt the request."

6/22/2019 12:32pm FU: "I will take care of this first when I arrive."

15

25. FU detailed one of her conversions in a WeChat audio message sent to LAX on or about August 22, 2019 at 12:02pm:

    a. First, FU sent a photo of a physical gift card to which funds had been transferred and the receipt documenting the conversion transaction which also displayed the use of a $3.00 grocery item in the same transaction.

    b. When LAX questioned FU about the grocery item, FU said she had bought a bag of chips, and "[t]aking this bag is like someone who's shopping. Otherwise, what do you bring to check out? It's not possible to swipe with empty hands. They surely won't let you swipe if you were empty handed." Continuing, FU explained why she made such small-dollar grocery item purchases: "I never eat these things. I never eat snacks. But I feel that it was too obvious, so I bought a bottle of water, and then I went back to buy another bottle of water."

26. Based on my training and experience and my knowledge of the evidence in this case, I interpret FU's message to LAX as admitting that she knew that she was purchasing products that she did not want solely for the purpose of being able to "convert" a gift card without arousing suspicion at Target.

## IV. CONCLUSION

27. For all the reasons described above, there is probable cause to believe that on or about June 15, 2020, in San Bernardino County, within the Central District of California, defendant YAN FU, knowing that the property involved in the financial transaction described below represented the proceeds of some form of unlawful activity, conducted the following

16

financial transaction affecting interstate commerce, which transaction in fact involved the proceeds of specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i):  the purchase of merchandise at Target using Victim-1's digital gift cards 041-221-550-583-960 and 041-221-550-584-620.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  16th day of
 November , 2020.

*Patricia Donahue*
_____

UNITED STATES MAGISTRATE JUDGE